IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20091086-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (July 19, 2012) |
| Samuel King, | ) | |
| | ) | 2012 UT App 203 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 081907657
The Honorable Judith S. Atherton

Attorneys:    Joan C. Watt, Salt Lake City, for Appellant
              Mark L. Shurtleff and Kris C. Leonard, Salt Lake City, for Appellee

-----

Before Judges McHugh, Orme, and Roth.

McHUGH, Presiding Judge:

¶1      Samuel King appeals his conviction for aggravated kidnapping (domestic
violence), a first degree felony, *see* Utah Code Ann. § 76-5-302 (2008); *id*. § 77-36-1 (Supp.
2011), and aggravated assault (domestic violence), a third degree felony, *see id*. § 76-5-
103; *id*. § 77-36-1.[1]  King claims that he received ineffective assistance of counsel in
several respects.  He asserts that trial counsel should have consulted a mental health
expert and sought discovery of the victim's mental health records.  In addition, King

---

        [1]Because subsequent amendments to these statutes are not relevant to our
analysis, we cite the current version of the Utah Code for the convenience of the reader.

contends that trial counsel failed to object to the introduction of a witness's out-of-court statements made during two police interviews. We affirm.

BACKGROUND

¶2     King and the victim (Victim) met sometime around the fall of 2007 and moved into an apartment together in the early part of 2008.[2] A few months later, the Social Security Administration determined that Victim's diagnosis of posttraumatic stress disorder, methamphetamine-induced psychosis, and depression rendered her disabled and awarded her a lump-sum disability payment of $26,000, as well as $859 in benefits per month. Shortly after Victim received the $26,000 payment, she and King began to have problems in their relationship. In particular, King became violent. He also demanded that Victim spend the money on him and became angry when she gave some of it to other people. Although Victim spent "probably [a] couple of thousand" on King and eventually gave him a cashier's check for $5,000, he was not satisfied. According to Victim, King would hit her and on one occasion he "picked [her] up by [the] throat and . . . strangl[ed]" her. Victim's former employer and friend (Friend), testified that Victim had told her about King's abuse and had shown Friend bruises. Friend helped Victim move out of the apartment in September 2008, but King continued to live in the apartment.

¶3     On September 25, 2008, Victim was at Pioneer Park (the park) where she smoked crack cocaine and drank some vodka that she shared with other individuals. King was also at the park drinking vodka with several people, including his friend Jackie, who was also taking drugs. After it became dark, Jackie approached Victim from behind and wrapped an electric cord around her throat.[3] Victim heard King instructing Jackie to do so. King and Jackie then forced Victim to a picnic table and secured her to it with the cord. King and another woman at the park (Ms. A) tried to hit Victim, but Jackie put her arm between Victim and the assailants to block their punches. Nevertheless,

---

[2]Because this case comes to this court after a jury trial, we view the "facts in a light most favorable to the jury's verdict" and "present conflicting evidence only as necessary to understand [the] issue[] raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (internal quotation marks omitted).

[3]Jackie testified that she draped a cord from a personal music device around Victim's neck because it belonged to Victim and she was returning it.

King still managed to hit Victim. During the confrontation, King showed Victim a knife and threatened to kill her. Eventually, King called a cab, forced Victim to get in at knife point, and warned that if Victim did not remain silent on the drive, he would kill her. The taxi dropped the trio at King's apartment. King and Jackie held Victim at the apartment against her will, where King threatened to kill her, burn her with a cigarette, and cut out her tongue. To make his point, King heated the blade of a knife on the kitchen stove and told Victim that he intended to use it on her.

¶4 Victim testified that throughout that night, King repeatedly stated that he and Jackie intended to take her to the bank in the morning so that she could withdraw the rest of her money and give it to them. At some point, King gave Jackie a roll of duct tape and told her to secure Victim. Jackie pulled Victim's hands behind her back and bound them together with the duct tape and then bound her ankles together. Victim did not resist because she was scared and crying. Afterward, King and Jackie drank vodka for another three to four hours, during which time King occasionally forced Victim to drink vodka too. King and Jackie eventually passed out, leaving Victim on the floor. While King and Jackie were sleeping, Victim was able to unravel enough of the duct tape to escape. Victim exited the apartment and walked to a convenience store, where she called the police.

¶5 A police officer (Officer) responded to the call at 4:30 a.m. and observed duct tape on Victim's wrists and ankles. Victim reported that Jackie had bound her with the duct tape, described a wire cord and folding knife with a white grip, and directed Officer to King's apartment. When Officer arrived, the door to the apartment was open and Jackie was sleeping in the living room. Close to Jackie, Officer saw a roll of black duct tape. He then knocked to announce himself, and Jackie invited him to enter. In King's bedroom, Officer saw a number of knives in plain view, including a knife with a white handle. Although Officer saw many cords in the apartment and recovered a white cord, the police did not recover the black cord that Victim reported had been used to secure her to the picnic table.

¶6 In the interim, another police officer transported Victim to the police station for an interview. Victim's hands and feet were still partially bound by the duct tape. A police detective (Detective) conducted the interview and observed that Victim was "very volatile emotionally" and "kind of shell shocked." At trial, Detective testified that it was apparent that Victim had "some mental health issues, but not enough to not track what [Detective] was saying to her[;] . . . she was capable of talking to [Detective] and answering the questions appropriately." A little over a week after that interview, Victim spoke with Detective again. Although Victim reported that King held a knife to

her side during the cab ride at the first interview, during the second interview she denied that this had happened. Victim was also vague about the timing of events at the apartment, including when she had escaped, and did not know what month it was presently. However, Victim consistently maintained that King had directed Jackie's actions.

¶7     Detective also interviewed Jackie on two separate occasions. The first interview was on the same morning that Detective first spoke with Victim. According to Detective, during the first interview, Jackie indicated "that [King] and [Ms. A] were trying to hit [Victim] at the park . . . and that [Jackie] . . . would block their attempts to assault [Victim]." Detective also reported that Jackie stated that King wanted Victim to pick up clothes she had left at the apartment. Victim was initially afraid to go to King's apartment, but Jackie assured her that everything would be all right because Jackie would go with her. According to Detective, Jackie further indicated that King was "f—ing with that bitch," referring to Victim, and that "he was scaring her." When Detective asked who placed duct tape on Victim, Jackie replied that "[Victim] liked to roam in the middle of the night," but did not directly answer the question. Detective also asked about the knife, but Jackie did not respond.

¶8     At some point, Detective interviewed Jackie again.[4] At the second interview, Detective used more aggressive interrogation tactics and "bluffed [Jackie] quite a bit." Detective opined that officers are permitted to "do any number of things . . . as long as [they're] not assaulting [the witness] or berating them or, you know, beating them down or, you know, touching them or any of those sorts of things." During the second interview, Detective told Jackie that the district attorney would give Jackie a deal and that "the duct tape came back with fingerprints, and the fingerprints were [King's]." Using those tactics, Detective was successful in getting Jackie to provide "a little bit more information than . . . the first time."

---

[4]The record does not contain a transcript of the second interview, but King has attached a partial transcript to his brief and asked us to supplement the record with it. While some of Detective's interrogation methods reflected in the part of the transcript available raise concerns, we decline King's request to make the partial transcript part of the record. *See State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279 ("[A]lthough the record may be supplemented if anything material is omitted, it may not be done by simply including the omitted material in the party's addendum.").

¶9     The State charged Jackie with felony kidnapping but allowed her to plead guilty to misdemeanor attempted assault in exchange for her testimony at King's trial. King was charged with two felonies: aggravated kidnapping (domestic violence), *see* Utah Code Ann. § 76-5-302 (2008); *id.* § 77-36-1 (Supp. 2011), and aggravated assault (domestic violence), *see id.* § 76-5-103; *id.* § 77-36-1. By the time of King's trial, Jackie had completed her sentence on the misdemeanor.

¶10    The State called Jackie as a witness at King's trial, apparently expecting her to implicate him in the crime. Instead, Jackie's direct testimony was rambling and inconsistent, and during cross-examination, she denied that King was involved in holding Victim against her will. She also indicated that the only knife involved was a small pocket knife that King gave to Victim so that she could clean her fingernails. Jackie also testified that on the afternoon of the incident, Victim thought her mother was dead until she spoke to her mother on King's cellular phone. The prosecutor reminded Jackie of statements she had made to him shortly before she took the stand that apparently implicated King and asked Jackie if she remembered making them. Jackie's responses were vague, evasive, and inconsistent. To further impeach Jackie's trial testimony, the prosecutor elicited testimony from Detective about statements Jackie made during the first and second interviews. King's trial counsel did not object to the prosecution's use of Jackie's prior statements.

¶11    The jury found King guilty of both charges. He now appeals.


ISSUE AND STANDARD OF REVIEW

¶12    King asserts that his trial counsel was ineffective. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law, which we review for correctness." *State v. Fowers*, 2011 UT App 383, ¶ 15, 265 P.3d 832 (internal quotation marks omitted).


ANALYSIS

¶13    Criminal defendants are entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). To prove a claim of ineffective assistance, the defendant must show (1) "'that counsel's performance was so deficient as to fall below an objective standard of reasonableness'" and (2) "'that but for counsel's deficient performance there is a

reasonable probability that the outcome of the trial would have been different.'" *See State v. Hales*, 2007 UT 14, ¶ 68, 152 P.3d 321 (quoting *State v. Gonzales*, 2005 UT 72, ¶ 64, 125 P.3d 878). "Failure to satisfy either component of this test is fatal to an ineffective assistance of counsel claim." *State v. C.D.L.*, 2011 UT App 55, ¶ 13, 250 P.3d 69, *cert. denied*, 255 P.3d 684 (Utah 2011). However, if the defendant succeeds on a claim of ineffectiveness, he will be entitled to a new trial. *See State v. Hales*, 2007 UT 14, ¶ 68, 152 P.3d 321.

¶14 Under the deficiency prong, trial counsel's performance is "presumed to be part of a sound trial strategy . . . within the wide range of reasonable professional assistance." *C.D.L.*, 2011 UT App 55, ¶ 13 (omission in original) (internal quotation marks omitted). This presumption may be overcome only if there is a "lack of any conceivable tactical basis for counsel's actions." *See id.* (internal quotation marks omitted). Accordingly, we "will assume trial counsel acted effectively if a rational basis for counsel's performance can be articulated." *Id.* (internal quotation marks omitted).

¶15 Under the prejudice prong, "'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Templin*, 805 P.2d 182, 187 (Utah 1990) (quoting *Strickland*, 466 U.S. at 694). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. With these standards in mind, we now address King's ineffectiveness claims.

## I. Rule 23B Arguments

¶16 Prior to briefing, King filed a motion to remand the case to the trial court for the entry of findings of fact necessary to support his ineffective assistance of counsel claim pursuant to rule 23B of the Utah Rules of Appellate Procedure. We denied King's motion because he "failed to establish the likelihood that any" presumed deficiency was prejudicial. We reasoned that the additional evidence identified in the rule 23B motion was "cumulative impeachment evidence regarding [Victim's] general credibility" and was "not likely to have resulted in a different outcome." We further noted that Victim's testimony was otherwise supported and that it was the jury's province to weigh the credibility of the witnesses.

¶17 King again raises the rule 23B issue in his appellate brief, asking us to reconsider our prior ruling. While there is no obligation to do so, we exercise our discretion to

reconsider King's 23B motion as part of our plenary review. *Cf. State v. Chavez-Espinoza*, 2008 UT App 191, ¶ 26, 186 P.3d 1023 (declining to revisit a rule 23B motion).

A. Counsel's Failure to Obtain an Expert

¶18    King asserts that his trial counsel was ineffective because the failure to obtain a mental health expert witness prevented counsel from investigating Victim's mental illness. Rule 23B provides that a remand may be granted "only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a). Thus, to succeed on his motion, King was required to allege facts that if true would show "that counsel's performance was so deficient as to fall below an objective standard of reasonableness" and (2) "that but for counsel's deficient performance there is a reasonable probability that the outcome of the trial would have been different." *See State v. Hales*, 2007 UT 14, ¶ 68, 152 P.3d 321 (internal quotation marks omitted).

    1.  Counsel's Performance Was Not Deficient

¶19    In support of his claim that counsel performed ineffectively by failing to call a mental health expert, King cites numerous authoritative sources that describe the impact of methamphetamine on the brain, including its effects on judgment, learning, memory, emotions, and cognitive ability. King points us to these sources' conclusions that methamphetamine use can lead to "psychosis," which "can sometimes last for months or years," and that these symptoms can be exacerbated when used "with other toxins, such as cocaine." King also attached an affidavit from a professor of pharmacology and toxicology at the University of Utah College of Pharmacy (Professor), which stated that "[m]ethamphetamine or cocaine abuse has long-lasting and sometimes permanent effects on the brain, altering a person's perceptions of, ability to recall, and ability to recount events." Professor indicates that "[e]ven short term use of methamphetamine or cocaine can have dramatic effects, including hallucinations, hyperthermia, paranoia, amnesia, anxiety, [and] confusion," and that in combination with alcohol "these drugs can be even more harmful." According to Professor, "a person with a psychos[i]s diagnos[i]s can experience significant impairment of cognitive processes—for months or even years—after he or she has stopped using methamphetamine." He also explains that stress and the abuse of other substances "can trigger a spontaneous recurrence" of psychosis of which the person may be unaware. Professor specifically opined that Victim's "ability to perceive and process events and to recall and recount them with accuracy" on the day of the incident and when relating them to the police "likely was significantly compromised due to mental illnesses, a

history of long-term drug use, use of drugs and alcohol on [the date of the incident], and her failure to receive proper treatment for her conditions."

¶20 Although King acknowledges that Victim admitted her substance abuse and mental health issues, he argues that her testimony "failed to shed light on how her mental illnesses and drug abuse would impair cognitive processes." King also asserts that Victim's testimony that "her psychosis disorder was fleeting," that she was "unaffected by crack cocaine," and that she "was sober on the night of the events here," combined with testimony from Detective that Victim's interview statements were understandable and "fairly decent overall," allowed incorrect information to be conveyed to the jury. Accordingly, King argues that trial counsel provided ineffective assistance by not presenting expert testimony on these points.

¶21 In support of this argument, King relies on rule 702 of the Utah Rules of Evidence, which allows expert witnesses to testify if their "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702.[5] King contends that trial counsel's performance was deficient under the Utah Supreme Court's decision in *State v. Clopten*, 2009 UT 84, 223 P.3d 1103, which held that "in cases where eyewitnesses are identifying a stranger and one or more established factors affecting accuracy are present, the testimony of a qualified expert is both reliable and helpful, as required by rule 702." *Id.* ¶ 49. The supreme court relied, in part, on empirical data indicating that most jurors are misinformed about the reliability of eyewitness testimony and that they therefore assign it disproportionate weight in their assessment of the evidence. *See id.* ¶ 15.

¶22 King argues that, as with eyewitness testimony, expert testimony can help the jury weigh the credibility of witnesses dealing with the combined effects of mental illness and substance abuse. However, the *Clopten* court held that the trial court exceeded its discretion by excluding expert testimony offered by the defense, not that trial counsel was ineffective for failing to offer an eyewitness identification expert. *See id.* ¶ 49. The supreme court in *Clopten* explained that trial courts are not required to admit "eyewitness expert testimony in every case" and should exclude such evidence where the expert's testimony will not assist the jury. *See id.* ¶ 33.

---

[5]The Utah Rules of Evidence were amended effective December 1, 2011. *See generally* Utah R. Evid. 702, 2011 advisory committee note. However, these changes were intended to be "stylistic only." *Id.* Accordingly, we cite the current version of the rules for the convenience of the reader.

¶23    In contrast, this case involves neither the exclusion of an expert offered by the defense nor a need to disabuse jurors of the notion that there is no exacerbating effect when mental illness and long-term drug abuse are combined.  While expert testimony might have been helpful if offered, we are unwilling to require that in every case where a key witness suffers from both addiction and mental illness such testimony must be offered.  Under the present facts, we are not convinced that trial counsel's failure to obtain such an expert fell below "the wide range of reasonable professional assistance." *See State v. C.D.L.*, 2011 UT App 55, ¶ 13, 250 P.3d 69 (internal quotation marks omitted), *cert. denied*, 255 P.3d 684 (Utah 2011).

2.  Counsel's Performance Did Not Harm King

¶24    Nonetheless, even if we were to assume without deciding that trial counsel's performance was deficient, we would not conclude that it was prejudicial.  This is because Professor's testimony would have been primarily cumulative of other impeachment evidence.

¶25    At trial, Victim admitted that she was a "drug addict," took prescription pain pills, had abused methamphetamine for "a year or two," used crack cocaine, and drank alcohol.  Victim further acknowledged that she sometimes used drugs and alcohol together and that, despite "detox" services, she was able to discontinue drug use for only four months.  Although Victim stated that she was not continuously using drugs, she acknowledged that she would occasionally "have a slip [and] fall" and had used crack cocaine about a month before trial.  Of particular significance was Victim's admission that on the day of the assault she had smoked crack cocaine and consumed alcohol.  Victim also admitted that she was intoxicated during the incident, although she claimed it was due to the vodka King and Jackie forced her to drink.

¶26    In addition, Victim testified that she has suffered from depression, posttraumatic stress disorder, and methamphetamine-induced psychosis.  Although Victim testified that "meth induced psychosis does not last forever," there was extensive evidence about Victim's ongoing mental health issues.  Jackie testified that earlier on the day of the attack, Victim was "talking crazy," and further indicated that Victim was prone to saying nonsensical things when she was using drugs and alcohol.  Jackie explained, "[Victim's] mind wasn't there, whatever you want to say.  Her mind wasn't there." Later in her testimony, Jackie reiterated that Victim sometimes "talk[s] crazy," explaining that if Victim is "on one for a couple of days, she's drinking, she's smoking [crack cocaine], by the second or third day she don't make no sense."  And Jackie reported that Victim "undergoes personality changes when she's high," and that when she adds alcohol, "it's even worse."  According to Jackie, "because [Victim has] mental

illness, [when she combines drugs and alcohol] she snaps." The jury also heard testimony from Friend, who had known Victim for over a decade, employed her, and let Victim live in her home. Friend testified that when Victim first told her about the incident at the apartment, she thought, "Wow, she's having a strange episode." Friend explained that Victim had experienced such episodes in the past and that they began after a man shot at Victim during a robbery at a convenience store where Victim then worked. When Victim told Friend what Jackie and King had done to her, Friend thought it was too outlandish to be real and concluded that Victim again "had a story to tell."

¶27 Where the jury knew about Victim's mental illness, psychosis, long-term abuse of drugs and alcohol, her use of crack cocaine and alcohol on the night in question, her tendency to "talk[] crazy" when she uses drugs and alcohol, and her trauma-induced episodes in the past, we are not convinced that King was prejudiced by trial counsel's decision not to call an expert. Professor's expert testimony regarding drug-induced psychosis, although possibly informative of the cause of Victim's mental health issues and the risk of spontaneous recurrence of psychosis, is unlikely to have made any significant additional impact on the jury's perception of Victim's ability to perceive and relate the events of the evening at issue.

¶28 Furthermore, trial counsel used the extensive evidence introduced at trial to argue forcefully that the jury should have "serious concerns" about the accusations due to Victim's "state of mind, her ability to recall the actual events free of delusion, free of confusion, free of paranoia, free of distraction, free of a severe crack and alcohol addiction, plus meth psychosis, [and] her disconnected ramblings." Trial counsel questioned whether Victim "could distinguish reality from delusion" and asserted that "she wandered in and out of coherence." In particular, trial counsel reminded the jury of inconsistencies in Victim's description of events and her vagueness about timing and other factual issues, explaining, "[W]hen you're delusional, you take some facts and you confuse them with your fantasy or your delusions." Trial counsel identified specific portions of Victim's testimony as "an example of her delusion, blending with some aspects of reality," including that Victim was "so out of it" that King had to convince her that her mother was not dead. Trial counsel stressed that "[i]f you do enough drugs you get psychotic . . . and you're not thinking clearly, and things get very confused." He argued that there was no evidence that a cord was used to tie Victim to the picnic table, despite cameras all over the park, and that there was neither evidence nor any motive to suggest that King and Jackie forced Victim to drink vodka while she was bound with the duct tape. Instead, trial counsel argued that Victim "distorted the cord being placed around her shoulders to [it] being wrapped around her neck" and "distorted drinking alcohol with her hands free to . . . having it being forced down."

¶29    In closing, trial counsel attacked Victim's credibility and emphasized the jury's duty to be selective in the evidence it believes, stating,

> [Victim] didn't know what month it was, much less what actually happened due to her severe state of intoxication and her psychoses, and you know, if you're taking prescription medication and you also drink, it potentiates[6] that and makes it even worse.

> She admits that she had been smoking crack cocaine and is still smoking crack cocaine.  Yeah, she's got some mental issues, but what is she doing about it?  Smoking crack cocaine. . . .  Would you make the most important decision of your life based on what she told you? . . .  Would you just ignore the ramblings, the paranoia, the delusions, the lies . . . ?

¶30    The lack of an expert did not prevent trial counsel from attacking Victim's credibility vigorously both in cross-examination and during closing argument.  Counsel used the facts presented at trial directly to establish that Victim could not distinguish her delusions from reality.  We are simply not persuaded that expert testimony on the likely effects of long-term drug abuse would have provided more compelling evidence.  Under these circumstances, there was not "a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Accordingly, we agree with this court's prior ruling that the additional testimony that might be available at a rule 23B hearing after remand could not "support a determination that counsel was ineffective." *See* Utah R. App. P. 23B(a).

B.  Counsel's Failure to Seek Discovery of Mental Health Records

¶31    King also asserts that a 23B remand hearing would establish that trial counsel was ineffective in failing to seek discovery of Victim's mental health files.  The essence of King's argument is that Victim's "mental-health files exist and contain extrinsic

---

    [6]Potentiation is defined by medical authorities as "a synergistic action in which the effect of two drugs given simultaneously is greater than the sum of the effects of each drug given separately." *Mosby's Medical Dictionary* (8th ed. 2009), *available at* http://medical-dictionary.thefreedictionary.com/potentiation.

evidence of disorders, which affected Victim's credibility as a witness, where her disorders are long term and they significantly affect her ability to accurately process events."

¶32    Although a witness's mental health files may be admissible under rule 506(d)(1) of the Utah Rules of Evidence, the supreme court has cautioned that the test for permitting the discovery of such files is "stringent." *See State v. Worthen*, 2009 UT 79, ¶ 38, 222 P.3d 1144.  First, the defense must show with "reasonable certainty" that the records contain "exculpatory evidence" that will be favorable to the defense and that this "necessarily requir[es] some type of extrinsic indication that the evidence within the records exists and will, in fact, be exculpatory." *Id.* (internal quotation marks omitted). The specific facts necessary to meet the reasonable certainty test are "references to records of only certain counseling sessions, which are alleged to be relevant, independent allegations made by others that a victim has recanted, or extrinsic evidence of some disorder that might lead to uncertainty regarding a victim's trustworthiness." *Id.* ¶ 41 (internal quotation marks omitted).

¶33    Here, when King's trial counsel initially sought discovery of Victim's mental health records, the trial court requested briefing on the issue.  Rather than submitting a supplemental brief, trial counsel withdrew his request for the records.  King's trial counsel stated that he withdrew the motion because after researching the law, he concluded that he would be "unable to meet the admissibility requirements."  Given the difficulty in obtaining such information under Utah law and the fact that counsel investigated the law before concluding that his efforts would be futile, we are not persuaded that trial counsel's performance was deficient. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶34    Nonetheless, even if we assume that trial counsel's decision not to pursue the matter further was deficient, we cannot conclude that it was prejudicial.  King alleges that the mental health files "exist and contain extrinsic evidence of disorders, which affected Victim's credibility as a witness, where her disorders are long term and they significantly affect her ability to accurately process events."  Again, this information is merely cumulative of the evidence presented to the jury about Victim's total disability due to mental illness, long-term abuse of methamphetamine, drug-induced psychosis, alcohol abuse, and use of drugs and alcohol on the day of the incident, and the testimony from other witnesses of her prior episodes and tendency to be incoherent when abusing drugs and alcohol.  The jury also heard that Victim became so confused while at the park that she mistakenly believed that her mother was dead.  This direct evidence of Victim's delusional lapses would be enhanced little by professional

diagnoses. Accordingly, King has not met his burden of showing that there was a reasonable probability that absent counsel's deficient performance, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694.

## II. Statements from Jackie's First Interview

¶35     King next contends that trial counsel was ineffective for failing to object to testimony from Detective about Jackie's statements during her first interview. King asserts that the statements are hearsay and should not have been admitted. The State responds that the statements were properly admitted under rule 801(d)(1) of the Utah Rules of Evidence, which provides that prior statements of a witness testifying at trial are admissible nonhearsay if the witness is "subject to cross-examination about a prior statement, and the statement . . . is inconsistent with the declarant's testimony or the declarant denies having made the statement or has forgotten." Utah R. Evid. 801(d)(1). King claims that Jackie's prior statements are not inconsistent with her trial testimony and, therefore, should not have been admitted.

¶36     According to King, Jackie's statements are not inconsistent under rule 801(d)(1)(A) because they do not "differ significantly" and are not "materially inconsistent" with her trial testimony. *See, e.g.*, *Iaccino v. Anderson*, 940 N.E.2d 742, 747 (Ill. App. Ct. 2010). However, in *State v. Whittle*, 1999 UT 96, 989 P.2d 52, the Utah Supreme Court suggested that inconsistent statements are "'not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position.'" *Id.* ¶ 21 n.4 (quoting *United States v. Matlock*, 109 F.3d 1313, 1319 (8th Cir. 1997)). Although this guidance was not essential to the court's holding in *Whittle*, it strongly implies that Utah will not apply rule 801(d)(1)(A) as restrictively as King suggests. Accordingly, we adopt this more lenient view of inconsistency in analyzing whether trial counsel was ineffective for failing to object to Detective's testimony about Jackie's first interview statements.

¶37     First, we determine that some of Jackie's statements during her first interview are inconsistent with her trial testimony and, therefore, admissible as nonhearsay under rule 801(d)(1)(A). Second, we conclude that some other statements are not inconsistent with Jackie's trial testimony, even under the more expansive view cited favorably by our supreme court. In reviewing which statements were properly admitted under rule 801(d)(1)(A), we compare Detective's statements about what Jackie said during the first interview with Jackie's trial testimony.

A. Inconsistent Statements

¶38    The first group of contested statements concern whether Jackie or King invited Victim to King's apartment and whether King wanted Victim there.  According to Detective, at her first interview,[7] Jackie stated, "[King] wanted [Victim] to come to the apartment to get the rest of her clothes."  At trial, however, Jackie stated that she invited Victim to the apartment and that King "didn't want [Victim] to go," he "didn't want her there," and that he "didn't want her at his house."  Although Jackie did make some statements suggesting that King wanted Victim to pick up her clothes from his apartment, her trial testimony was unclear and somewhat inconsistent.  Because these statements are, at a minimum, evasive or the reflection of a change in position, *see Whittle*, 1999 UT 96, ¶ 21 n.4, trial counsel reasonably could have concluded that they were admissible under rule 801(d)(1)(A).  Accordingly, trial counsel's failure to object to these statements did not fall below an acceptable level of performance. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel.").

¶39    The next statements concern whether King tried to hit Victim while at the park.  King argues that Jackie consistently stated, both in the interviews and at trial, that King and others wanted to hit Victim while they were at the park.  In contrast, the State asserts that Jackie's first interview statements indicated that King tried to hit Victim at the park, but that her trial testimony vacillated from an inability to remember to a denial that King tried to hit Victim.  We agree with the State that Jackie's statements were inconsistent.  Detective testified that, at the first interview, Jackie stated "that [King] and [Ms. A] were trying to hit [Victim] at the park, . . . and that [Jackie] . . . would block their attempts to assault [Victim]."  When the prosecutor asked Jackie at trial if she had to protect Victim from King, however, Jackie answered, "I don't recall now," and volunteered that she could not have stopped King from hitting Victim if he was so inclined.[8]  But when King's counsel asked, "[King] wasn't trying to do [Victim] any harm?," Jackie agreed, stating, "No, he wasn't, but if he wanted to get to her, he could get to her."  Later in her cross-examination, Jackie again indicated that King did not "make any effort to strike [Victim] physically at the park."  This trial testimony is directly at odds with Detective's report of Jackie's pretrial statements.  Accordingly, the

_____

[7]The record does not contain a transcript of the first interview.

[8]In King's brief, he notes that Jackie testified that King did not threaten Victim and that Jackie would not let King hit Victim.  However, this testimony relates to what occurred at the apartment, not the park.

statements were admissible under rule 801(d)(1)(A), and trial counsel did not perform deficiently in not objecting to them. *See Kelley*, 2000 UT 41, ¶ 26.

¶40   King also objects to the use of Jackie's first interview statement that King threatened Victim once the trio arrived at his apartment. Detective indicated that Jackie said King "was f—ing with that bitch, and he was scaring her." At trial, when asked if King had threatened Victim, Jackie responded that "[n]o, he didn't threaten her." However, the State then asked whether King had threatened Victim with a cigarette, and Jackie replied, "Oh, he did, [King] went like this with it, but he didn't burn her. Okay. He threatened her, so—she wasn't burned." Then on cross-examination, Jackie testified that King "didn't heat no knife up. I'm in the kitchen cooking. How are you going to heat up—I'm cooking in the kitchen." Jackie's trial testimony was internally inconsistent, evasive, and evidenced a change in position. Consequently, we agree with the State that the interview statements were admissible under rule 801(d)(1)(A) and that trial counsel did not perform deficiently by failing to object to their admission. *See Kelley*, 2000 UT 41, ¶ 26.

¶41   King next objects to Detective's testimony that during the first interview, Jackie refused to answer whether King had a knife at the apartment.[9] At trial, however, Jackie testified that King gave Victim a knife to clean her fingernails. Our supreme court has indicated that a person's initial silence followed by later exculpatory statements can be inconsistent under some circumstances:

> It is also in accord with human experience that if a person knows facts which would tend to protect others whose interests are in hazard, . . . he will generally speak up when opportunity is afforded and offer the protection rather than to remain silent and withhold it. Accordingly, when a person claims to have exculpatory information and remains silent when it would be natural to expect that persons of normal sensibilities and concern for others would speak, that fact may be shown as having a bearing on the credibility of the witness and upon the existence or nonexistence of the facts the witness later comes forward to assert.

_____

[9]At her second interview, Jackie asked Detective to describe the knife used in the attack. When Detective said that it was "a white handled knife," Jackie responded, "[T]hat's not the one."

*State v. Brown*, 16 Utah 2d 57, 395 P.2d 727, 729 (1964); *see also Fletcher v. Weir*, 455 U.S. 603, 604-06 (1982) (per curiam) (explaining that the "'[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted'" (quoting *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980))); *Davis v. State*, 686 A.2d 1083, 1085-86 (Md. 1996) (collecting cases explaining that silence can be inconsistent in some contexts and stating that silence is relevant if "the natural response of the witness [would] be to come forward, at the earliest possible time, with any exculpatory information regarding the defendant, he or she may have and relate it to the police or the prosecution"); 3A John Henry Wigmore, *Wigmore on Evidence* § 1042 (Chadbourne rev. 1970) ("A *failure* to *assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact.").

¶42     Here, both Officer and Detective informed Jackie of the right to remain silent before conducting any interrogation.  Nevertheless, Jackie waived that right and answered most of Detective's questions.  While she may still have been reluctant to relate facts likely to incriminate herself or King, Jackie would have been naturally inclined to provide details that were exculpatory.  Jackie testified that King is a friend she has known for many years.  Thus, she would have been naturally inclined to tell Detective that the knife Victim remembers was provided so Victim could clean her fingernails.  Moreover, Jackie's testimony provided the jury with a benign explanation for Victim's memory of the knife, which fit neatly within the defense theory that Victim's combination of substance abuse and mental illness caused her to misinterpret nonthreatening events.  Consequently, the fact that she had earlier refused to answer questions about the knife might reasonably have been admissible, and trial counsel was not ineffective for failing to object to it.

B.  Consistent Statements

¶43     Notwithstanding our conclusion that some of Detective's testimony regarding the first interview with Jackie was properly admitted, we determine that other portions of that testimony were not.  Where the statements related by Detective cannot fairly be characterized as inconsistent, they were not properly admissible under rule 801(d)(1)(A) or for impeachment.

¶44     The statements in this category concern whether Victim wanted to go to King's apartment and if she was afraid to go there.  King asserts that Jackie consistently stated that although Victim was afraid to go to the apartment, Jackie assured her that "everything would be okay."  The State argues that at the initial interview with

Detective, Jackie stated that "[Victim] was afraid to go to Defendant's apartment," but at trial "Jackie testified that [Victim] wanted to go to the apartment, but that she was afraid that Defendant was mad at her." After reviewing the record, we agree with King that these statements are not inconsistent. Throughout the trial, Jackie asserted that although Victim was afraid to go to King's apartment, Jackie assured her that everything would be fine. With regard to the first interview, the State asked Detective if Jackie's trial testimony that "[Victim] wasn't forced to go, wasn't coerced to go. Was . . . consistent with what [Jackie] told [her] at the [first interview]." Detective responded, "No. She indicated that [Victim] was afraid to go to the apartment, and that she had assured her that everything would be okay because she was going back with her." Although Detective interpreted Jackie's assurances that "everything would be okay" as coercion, she related no statements from the first interview inconsistent with Jackie's trial testimony. Instead, Detective's report of the first interview statements are quite similar to Jackie's testimony at trial. Thus, we conclude that trial counsel could have successfully objected to the introduction of these prior statements as hearsay.

¶45    The next statements involve who placed the duct tape on Victim. King argues that Jackie's statements were consistent because she mentioned nothing about the duct tape at the first interview and at trial she did not recall telling Detective otherwise. Detective testified that during the first interview, she asked Jackie about the duct tape and that Jackie stated King had told her that "[Victim] liked to roam in the middle of the night." At trial, Jackie denied taping Victim, denied that King taped Victim, and then later admitted she must have taped Victim. Her later testimony about who did or did not place duct tape on Victim is not inconsistent with her prior statement to Detective. Thus, we assume it would have been excluded upon objection.

¶46    Accordingly, we assume that each of these statements would not have been admissible under rule 801(d)(1)(A) if trial counsel had raised an objection. We also assume without deciding that trial counsel's failure to object fell below an acceptable level of performance. Thus, we proceed to the prejudice prong of the ineffective assistance analysis and consider whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "When we examine counsel's alleged errors, we 'consider the totality of the evidence' to determine whether the errors 'alter[ed] the entire evidentiary picture' and whether the verdict is supported by the record." *State v. Lenkart*, 2011 UT 27, ¶ 38, 262 P.3d 1 (quoting *Strickland*, 466 U.S. at 695-96). Applying that test, we conclude that counsel's failure to object to the admission of these consistent statements did not prejudice King.

¶47    Where Jackie's interview statements were consistent with her trial testimony, they neither undermined her credibility nor provided information otherwise unavailable to the jury. In addition, the jury had an opportunity to observe Jackie, listen to her often rambling and inconsistent testimony, and make its own assessment of her credibility. Furthermore, the consistent statements from the first interview were relatively minor in comparison with Jackie's other admissible interview statements, her trial testimony, and the evidentiary picture as a whole. Considering the totality of the evidence as we must, *see Strickland*, 466 U.S. at 695-96, we cannot conclude that there is a reasonable probability of a different outcome in the absence of the improperly admitted statements from Jackie's first interview. *See Lenkart*, 2011 UT 27, ¶ 38. Accordingly, we determine that King was not prejudiced by these statements from Jackie's first interview.

III.  Statements from Jackie's Second Interview

¶48    King also claims that trial counsel acted ineffectively by not objecting to Detective's testimony concerning Jackie's statements during the second interview. According to King, Detective improperly coerced Jackie into implicating King at the second interview and, therefore, her statements were unreliable and should have been excluded. However, we need not reach this issue because not objecting to the statements from Jackie's second interview is consistent with a reasonable trial strategy. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 39, 267 P.3d 232 (recognizing a "range of legitimate decisions regarding how best to represent" the defendant).

¶49    To show that trial counsel's performance was deficient as required under the first prong of the *Strickland* test, the defendant must "'overcome the strong presumption that trial counsel rendered adequate assistance and exercised reasonable professional judgment.'" *See Archuleta*, 2011 UT 73, ¶ 39 (quoting *State v. Bullock*, 791 P.2d 155, 159-60 (Utah 1989)). Under this deferential standard, we are convinced that trial counsel's performance fell "'within the wide range of reasonable professional assistance,' and that 'under the circumstances, the challenged action might be considered sound trial strategy.'" *See Lenkart*, 2011 UT 27, ¶ 25 (quoting *Strickland*, 466 U.S. at 689).

¶50    The record supports a conclusion that trial counsel advanced a defense based on the inherent unreliability of Victim's testimony and Detective's inappropriate

investigation.[10]  With respect to Detective's investigation, trial counsel challenged her failure to verify the accuracy of Victim's account of events, her use of inappropriate interview tactics, and her bias against King.

¶51    In establishing the failure to confirm Victim's story, trial counsel first highlighted Detective's failure to ask Ms. A about the black cord Victim claimed was used to secure her to the picnic table.  Second, trial counsel established that the only cord retrieved from the apartment was white and that no effort had been made to search again for a black cord.  Third, trial counsel focused on the knife and questioned Detective's decision not to bring it to trial.  Trial counsel suggested that Victim was describing her own white knife, which is distinguishable by a picture of a deer on the handle, and implied that the State introduced only a picture of the knife found in King's apartment to prevent the defense from showing the jury the deer on the side of the handle not shown.  Fourth, trial counsel challenged Detective's failure to examine the knife blade to determine whether it showed any discoloration that might have been caused by heating it on the stove as Victim had alleged.  Fifth, counsel called the jury's attention to the fact that the investigation did not include any test of the knife for duct tape residue, the absence of which would call into question Victim's description of events.  Sixth, trial counsel challenged Detective's failure to request an analysis of Victim's clothing for traces of alcohol that would naturally have spilled on her if King had forced her to drink Vodka while her hands were taped behind her back.  The clear thrust of this examination was to establish that Detective jumped to the conclusion that King was guilty and did nothing to investigate whether Victim was telling the truth.

¶52    That theme continued with trial counsel's criticism during cross-examination of Detective's interviewing methods.  He first elicited testimony that both King and Jackie "spoke to [Detective] without the benefit of an attorney there to control [the] interview" and that their statements were "not sworn statements."  Next, trial counsel established that King told Detective that he had no involvement in duct taping Victim and further speculated that Victim "was crazy" and may have "tied herself up."  Trial counsel then contrasted the two interviews.  He obtained Detective's admission that during the first interview, Jackie "didn't want to fully admit her involvement" but that after Detective told Jackie "a bunch of lies" during the second interview, Jackie provided more information.  Counsel asked Detective to admit that she had misinformed Jackie that King's fingerprints were on the duct tape, that King had turned on Jackie, and that King

---

[10]We have discussed trial counsel's vigorous attack on Victim's credibility in our analysis of the rule 23B issue.  *See supra* ¶¶ 28-30.

was blaming Jackie for the crimes. He then suggested that "if you lie to somebody they'll just lie right back to you, especially if they don't trust you," and Detective responded, "That's what happens, you know." Finally, trial counsel directly challenged Detective's credibility by illustrating that a statement she attributed to Jackie appears nowhere in the transcript of that second interview.

¶53 Trial counsel also strongly challenged the police tactics, including the tenor and reliability of the information obtained at the second interview. During his cross-examination of Jackie, trial counsel established that the State told her that "they didn't want [her], they wanted [King]." Trial counsel had her describe the deal she made with the State to testify truthfully at King's trial in exchange for allowing her to plead guilty to a class A misdemeanor instead of two felonies. After eliciting assurances that she was testifying truthfully at trial, counsel had Jackie describe the encounter with Victim, during which she accepted all blame and absolved King of any involvement. When trial counsel asked about the conflict between her trial testimony and the second interview statements, Jackie indicated that Detective was lying so Jackie decided to "lie[] back to her." During trial counsel's examination, Jackie testified that Detective had judged King "by his color," and stated, "[J]ust look at his eyes," as an indication that King was guilty. According to Jackie, Detective "didn't like [King] no way. She just didn't like him. It ain't nothing he did." During redirect examination, Jackie stated that she "must have got frantic" when she learned the police intended to dust the duct tape for fingerprints and that she "was scared" because she "had never been in anything like this before." Jackie testified, "I'm too old to go to prison for five to life." On recross-examination, trial counsel again evoked testimony that Jackie was "scared to death" when she was "looking at five to life" and that Detective told her, "'[W]e want [King] . . . he got to be guilty.'"

¶54 Trial counsel used the tactics employed by Detective during Jackie's second interview to support the defense strategy of undermining the State's case by showing bias in the investigation. Indeed, trial counsel's first line in closing argument was "Jackie said the [D]etective said to her, 'Just look in his eyes,' meaning that you know he did it." He then stressed that there had been no meaningful investigation of the physical evidence or the accuracy of Victim's version of events. Counsel reiterated that theme throughout closing argument, stating that the police "went in and they said, 'Look, into his eyes. We want to get [King]. We'll make you a deal, substantially reduce these charges. You testify against him,'" and that "[i]n their rush to convict [King], they said, 'We'll make you a deal. Great. You're out of here,'" but that they did not want to hear the truth because "they were determined to get [King]."

¶55 Based on the prosecutor's questions during direct examination, the jury was aware that Jackie's trial testimony was different than what she had said previously. And trial counsel likely knew that some of Jackie's inconsistent statements from the first interview were properly admissible. *See supra* ¶¶ 38-42. Where the jury would be aware of these discrepancies, trial counsel could have reasonably decided to explain them by attacking the interview methods used during the second interview, rather than objecting to the admission of those statements.

¶56 In summary, trial counsel used the second interview to highlight police bias, including Jackie's indication that the officers told her, "We want [King]." Through that second interview, trial counsel showed that Detective was willing to employ extreme tactics to obtain incriminating information about King. Trial counsel elicited testimony that Jackie decided to lie right back to Detective by implicating King. By doing so, trial counsel was able to undermine the credibility of Jackie's second interview statements, some of which he likely anticipated may be admitted. He was also able to challenge the police investigation generally as being inappropriately focused on King to the exclusion of any thoughtful inquest. *See State v. Clark*, 2004 UT 25, ¶ 7, 89 P.3d 162 (holding that defense counsel's failure to object to the testimony of two witnesses may have been "a reasonable tactical choice" in part because it gave him "considerable leverage in discrediting that testimony during cross-examination").

¶57 Under these circumstances, King has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" that "might be considered sound trial strategy." *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) (internal quotation marks omitted); *cf. State v. Powell*, 2007 UT 9, ¶¶ 46-47, 154 P.3d 788 (holding that failure to object to generic evidence of the defendant's prior felony conviction may have been a strategic concession to prevent further elaboration of the defendant's extensive criminal record). Accordingly, we reject King's argument that trial counsel was ineffective for not objecting to the admission of Jackie's second interview statements.

CONCLUSION

¶58 King's rule 23B motion is denied because the evidence sought on remand is merely cumulative of extensive evidence presented at trial relating to Victim's credibility. Additionally, King's trial counsel was not ineffective in failing to object to Detective's testimony about Jackie's first interview statements because some of those statements were contradictory and others were not harmful. Finally, the failure to

object to the introduction of the second interview statements was consistent with sound trial strategy and, therefore, not defective.

¶59    Affirmed.


_____
Carolyn B. McHugh,
Presiding Judge


                                        -----

¶60    WE CONCUR:


_____
Gregory K. Orme, Judge


_____
Stephen L. Roth, Judge