2013 UT App 142

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
JUSTIN GEORGE WRIGHT,
Defendant and Appellant.

Opinion
No. 20090643-CA
Filed June 20, 2013

Third District, Salt Lake Department
The Honorable Paul G. Maughan
No. 081908349

Lori J. Seppi, Attorney for Appellant
John E. Swallow and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which
JUDGES GREGORY K. ORME and WILLIAM A. THORNE JR. concurred.

ROTH, Judge:

¶1     Justin George Wright challenges his conviction for aggravated sexual abuse of a child on three grounds. First, Wright contends that his trial counsel provided ineffective assistance in investigating and presenting his defense. Wright next argues that the district court erred when it permitted the jury to hear inadmissible expert testimony. Finally, he asserts prosecutorial misconduct during closing statements. We affirm.

## BACKGROUND

¶2     Wright was charged by information with two counts of aggravated sexual abuse of a child after his daughter (Daughter)

reported that Wright "put his hands down her pants and touched her buttocks and vaginal area" while they were lying on a couch. She also reported that Wright sometimes "put his hand down her shirt and touched her breast area." According to Daughter, this conduct began when she was six or seven years old and continued until August or September 2007, when she was nine years old, at which time Wright moved to Las Vegas to attend school. Daughter did not report the abuse until July 2008, approximately ten months after it had ended. She first told her eleven-year-old cousin but made her cousin promise not to tell because she did not want them to get in trouble if they were not believed and because she was afraid that Wright might go to jail and then kidnap her once he was released. In August 2008, Daughter disclosed the abuse to her mother (Mother) and Mother's fiancé.

¶3   Wright was tried by jury on May 5–6, 2009. At the trial, Daughter testified that when she visited Wright at his apartment, they would watch television while lying on the couch. Wright would lie behind Daughter and move the telephone behind him. Wright would then put his hands down her pants, under her underwear, touching her vagina and her buttocks, and, on occasion, under her shirt, placing his hand over her heart. Daughter reported that Wright touched her in this way "[m]aybe more than 10" times with the last incident occurring "a few weeks before he moved." Daughter further testified that she did not tell Mother right away because Daughter "was afraid she wouldn't believe [her]." Nevertheless, Daughter explained that she was able to disclose the abuse to her cousin because she "felt like [she] could trust her" but that she still feared what might happen if the cousin revealed the abuse, including that Wright might kidnap her. Daughter testified that her fear of being kidnapped stemmed from a television episode of *America's Most Wanted* that she had viewed sometime in 2007 or early 2008, in which the "dad . . . was touching his daughter . . . inappropriately" and "went to jail[, then] he got out and he kidnaped her." In response to defense counsel's questions about her visits with Wright after he moved to Las Vegas, Daughter testified that he did not touch her sexually during those visits and that she had "a pretty good time visiting him."

Daughter also confirmed that her relationship with her father was "physically affectionate" and that Wright never threatened her or told her not to report the touching to anyone.

¶4 Mother and her fiancé each testified about the circumstances that led to the disclosure and what Daughter had told them. According to them, Mother, her fiancé, and Daughter were out to dinner when Daughter told them that Wright had threatened to sue Mother for custody. Daughter seemed "nervous" about the situation, but Mother told Daughter not to worry about it because "[i]t's an adult situation" that Wright "shouldn't be bringing . . . up with [Daughter] in the first place." Mother told Daughter that she would "talk to [Wright] about it" and "just kind of let it go." The next morning, however, Mother "felt bad" because she typically "tr[ied] to keep the communication open" by "mak[ing Daughter] talk to [her] about what she was feeling" when she was upset. Fearing that she may have been too dismissive with Daughter and noticing that Daughter was "still a little quiet," Mother assured Daughter that she could "tell me things," even if someone had made a threat, and analogized the situation to when they had discussed the difference between good and bad touching and why Daughter should tell Mother if someone touched her inappropriately. Daughter then disclosed the abuse. Mother called the Division of Child and Family Services, which referred her to Detective Peggy Faulkner, an investigator assigned to the Family Crimes Unit of the Salt Lake County Sheriff's Office Investigations Division.

¶5 Detective Faulkner interviewed Daughter as part of the investigation that ensued from the sexual abuse Daughter reported. Detective Faulkner also testified at trial. In the course of its direct examination, the State asked Detective Faulkner, "Is it uncommon for you to have cases involving a disclosure that comes years after an initial event of touching?" Detective Faulkner responded, "No. No." Wright's counsel did not object to this question. But when the State followed up by asking how many cases Detective Faulkner had handled where the disclosure occurred a significant period of time after the abuse, Wright's counsel did object, arguing that

Detective Faulkner was never designated as an expert witness and that the question seemed to require expert testimony. He also objected on grounds of "relevance." The court overruled Wright's objections. Detective Faulkner then answered, "I would be willing to say that at least a third of my cases . . . are victims where they have either become 18 and are [o]lder or they've endured the abuse living with the suspect without telling anyone for years."

¶6    The defense called Wright's mother, his sister, and Wright himself. Wright's mother testified that Wright and Daughter were "very affectionate," "[a]lways" "snuggling on the couch, watching TV" with Wright lying behind Daughter. Wright also testified about the "affectionate" nature of his relationship with Daughter. Wright explained that his family was physically "[v]ery loving[, v]ery affectionate" and that he raised Daughter the same way. In particular, Wright described how he would "lay [on] his [grandfather's] lap and have him scratch [his] back[]." Wright drew a comparison between that activity and his lying on the couch with Daughter and tickling her stomach and back. Wright also testified about how he had planned to "gain partial custody" of Daughter once he moved back to Utah. According to Wright, he told Mother about his plan shortly before he moved and "it caused a big fight." He also explained that while he was living in Las Vegas, his phone contact with Daughter became less frequent.

¶7    Wright's mother described her own relationship with Daughter as "very close" and explained that they would regularly engage in "girl talk," during which Wright's mother had talked to Daughter about inappropriate touching and Daughter told her "private things." Daughter never disclosed that Wright was inappropriately touching her during these talks. Wright's sister testified that Daughter was "like [her] little sister" and they too were "really close." Wright's sister explained that Daughter was comfortable talking to her and sometimes talked to her about boys she liked, but Daughter had never reported or even hinted that Wright was sexually abusing her.

¶8     In his closing statement, defense counsel suggested that Daughter's testimony could be the product of her imagination based on events that occurred on age-inappropriate television programs that Daughter watched, such as *America's Most Wanted*. According to counsel, the abuse was not real, but Daughter had recast an event she had seen on television as something that had happened to her by transforming, over time, Wright's innocent and affectionate touching into something inappropriate. Defense counsel attributed this to Daughter's recent decision to call Mother's fiancé, "Dad," and her resulting guilt from "turning her back on [Wright] for another father. But if over time she has convinced herself that he's a pedophile, that he's abused her from an emotional perspective[,] it makes it easier and it makes it okay." Counsel also argued that "[i]t worked" because Daughter "has gotten exactly what she wants. She is with the family she wants to be with[ and s]he doesn't have to see [Wright]." The prosecutor responded,

> [T]here is absolutely no reason not to believe [Daughter], who, as I told you before gave you every single piece of evidence that you need for the elements of this crime. [Daughter] doesn't want to hurt her father. She loved him even after he did horrible things to her. She just wants him to stop hurting her. You have the power to make that stop.

¶9     The jury convicted Wright on one count of aggravated sexual abuse of a child and acquitted him on the other count.[1]

---

1. Wright was tried on two counts of aggravated sexual abuse of a child for the first and the last times that he purportedly sexually touched Daughter. During deliberation, the jury sent a note to the court, inquiring,
    "We would like some clarification on the different counts. We take the separate counts to mean separate instances of the alleged crime. If so, we feel the
    (continued...)

Wright appealed, and on his motion, this court remanded the case to the district court to conduct a hearing pursuant to rule 23B of the Utah Rules of Appellate Procedure on the claims that trial counsel had been ineffective because he had not reasonably investigated or pursued a fabrication defense and he did not effectively use available witnesses and evidence at trial. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the [appellate] court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). The district court on rule 23B remand concluded that Wright's trial counsel had not been ineffective. The court supported its decision with detailed factual findings.

ISSUES AND STANDARDS OF REVIEW

¶10    Wright makes three claims on appeal. First, he argues that trial counsel provided ineffective assistance when he failed to adequately investigate the merits of both the defense urged by Wright (fabrication) and the defense trial counsel pursued (mistake). Wright also asserts that counsel underutilized available evidence and witnesses at trial. "In ruling on an ineffective assistance claim following a Rule 23B hearing, [appellate courts] defer to the trial court's findings of fact, but review its legal

---

1. (...continued)

        evidence may support different conclusions for each count.

           For instance the evidence of the incident happening in August 2007 [as opposed to the incident occurring in March 2005] is stronger. Therefore, if we conclude guilty for this date, which count, (Count I or II) would this apply?"

Upon the advice of counsel, the court instructed the jury, "Count one applies to the earlier date. Count two applies to the later date." The jury convicted Wright on count two.

conclusions for correctness." *State v. Bredehoft*, 966 P.2d 285, 289 (Utah Ct. App. 1998) (citation and internal quotation marks omitted). "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

¶11    Next, Wright asserts that the district court erred in allowing Detective Faulkner to testify about the incidence of delayed reporting in sexual abuse cases when Detective Faulkner had not been designated or qualified as an expert witness. Ordinarily, we review evidentiary rulings regarding the admissibility of witness testimony for abuse of discretion. *State v. Tarrats*, 2005 UT 50, ¶ 16, 122 P.3d 581 ("[W]e will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." (citation and internal quotation marks omitted)). The State, however, argues that this issue was not preserved and that our review is accordingly limited to determining whether the court committed plain error or counsel provided ineffective assistance. To make out a claim of plain error, "a defendant must demonstrate that [1] an error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *State v. Sellers*, 2011 UT App 38, ¶ 8, 248 P.3d 70 (alterations in original) (citation and internal quotation marks omitted). To establish ineffective assistance, a defendant must show that counsel's performance was deficient and prejudicial "to the degree that but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different." *Id.* ¶ 9 (citation and internal quotation marks omitted); *accord Strickland v. Washington*, 466 U.S. 668, 694 (1984) (explaining that "[a] reasonable probability is a probability sufficient to undermine confidence" in the verdict).

¶12    Finally, Wright claims prosecutorial misconduct during the State's closing statement. Because Wright did not object to the prosecutor's statements in the district court, we review the claim

under the doctrines of plain error and ineffective assistance of counsel. *See Sellers*, 2001 UT App 38, ¶¶ 7–9.

ANALYSIS

I. Ineffective Assistance of Counsel

¶13    Wright argues that he is entitled to a new trial because he received ineffective assistance from his trial counsel. To establish ineffective assistance, "a defendant must . . . demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment[,] . . . [and] show that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92. To show that his counsel performed inadequately, a defendant must "rebut the strong presumption that under the circumstances the challenged action might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted). This presumption "may be overcome only if there is a lack of any conceivable tactical basis for counsel's actions." *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 (citation and internal quotation marks omitted). "Additionally, because both deficiency and prejudice must be shown, a reviewing court can dispose of an ineffectiveness claim on either ground." *State v. Bair*, 2012 UT App 106, ¶ 49, 275 P.3d 1050 (citation and internal quotation marks omitted).

¶14    Wright claims that his counsel was ineffective because he failed to adequately investigate Wright's preferred defense of fabrication, failed to adequately investigate the mistake defense counsel advocated, and failed to make effective use of the available witnesses and evidence at trial. On Wright's motion, we remanded the case to the district court to make findings necessary to the determination of whether trial counsel failed to reasonably investigate a fabrication defense and to make appropriate use of

the available witnesses and evidence.[2] Wright has raised the failure to investigate a mistake defense for the first time on appeal. In this section, we will first address Wright's claims that counsel failed to investigate the two possible defenses, including his claim that a complete investigation of the fabrication defense would have caused counsel to "realize[] that his reasons for doubting the viability of the defense were unfounded." We will then consider counsel's decisions not to use the exhibits Wright provided him and not to call certain witnesses at trial. Finally, we will evaluate Wright's claim that counsel did not effectively examine Wright's mother and sister at trial.

A. Counsel Did Not Fail To Investigate the Potential Defenses, and His Pursuit of a Mistake Defense Was a Reasonable Tactical Decision.

¶15    Wright claims that counsel failed to reasonably investigate either Wright's preferred defense of fabrication or the mistake defense that counsel actually presented. With regard to the fabrication defense, Wright argues that counsel, having heard Daughter's and Mother's testimonies at the preliminary hearing, did not fully consider all of the testimony about the acrimony between Mother and Wright as well as the circumstances leading to Daughter's disclosure that Wright's witnesses were prepared to provide in response at trial. In particular, the witnesses could have explained that Mother had recently insisted that Daughter call Mother's fiancé, "Dad," and that Mother had told Daughter that Wright was planning to seek custody of Daughter. Wright claims that had counsel conducted such an investigation, counsel not only would have seen the viability of a fabrication defense but also would have viewed it as superior to the mistake defense. With respect to his claim that counsel failed to conduct an adequate investigation of the mistake defense, Wright asserts that counsel

---

2. We commend the district court for the care and detail with which it entered its findings and conclusions.

did not research the defense sufficiently to be able to effectively explain to the jury why Daughter was mistaken.

¶16    The Utah Supreme Court has stated that "counsel can make a reasonable decision to call or not to call particular witnesses for tactical reasons" in presenting a defense "only after an adequate inquiry" into "the underlying facts of a case, including the availability of prospective defense witnesses." *State v. Templin*, 805 P.2d 182, 188 (Utah 1991). Wright contends that because testimony from several potential defense witnesses would have supported his claim that Daughter had been induced to lie, his counsel must have inadequately investigated a fabrication defense. On remand, however, the district court determined that counsel "knew of the substance of the testimony" of available defense witnesses and "adequately investigated their potential testimony," although it recognized that counsel "only spent a minimal amount of time preparing" one witness who had information pertinent to the fabrication defense. Wright has not contested the court's findings that counsel was adequately aware of the testimony supporting a fabrication defense. Wright has therefore failed to demonstrate that counsel's investigation fell outside the "wide range of reasonable professional assistance." *See Strickland v. Washington*, 466 U.S. 668, 689 (1984).

¶17    Wright also claims that counsel's investigation of the mistake defense was incomplete because he relied on Daughter's exposure to "adult content" in age-inappropriate television programs and books without researching their contents. According to Wright, had counsel investigated, he would have learned that the television programs Daughter may have been exposed to covered the topics of sexuality, family discord, and use of abuse allegations to alienate an accused parent and that Daughter was reading books that contained sexual content "too graphic for a ten-year-old child." The State counters that Wright's claim requires speculation that the contents of the television shows and books would have bolstered the defense. We agree. Wright's claim is based on the premise that additional research into the content of the media to which Daughter might have been exposed would

have provided information useful to the mistake defense. While there is evidence in the record that Daughter "loved" watching *Oprah* and also watched *America's Most Wanted* and *Dr. Phil* on occasion, Wright has failed to support, with specific facts, his contention that counsel's failure to look further into this subject would likely have provided substantial additional evidence to support a mistake defense. For example, Wright identifies the suggestive titles of several episodes of *Dr. Phil* (e.g., "Is there a Predator in the House?," "Family Court Battles," "Controversial Love Affairs," and "You're a Liar!"). He fails, however, to show either that Daughter actually watched the specific episodes he identifies, which he claims would have provided her with information helpful to the fabrication of her abuse allegations or may have caused her to misinterpret innocent touching as sexual and inappropriate, or that she watched the programs frequently enough that her exposure to specific programs could reasonably be inferred. Nor has Wright adequately identified what he claims to be the graphic sexual content of the books she read or analyzed how the content of such books might be shown to have affected her disclosure. As a consequence, his contentions are too vague to support more than speculation that counsel was deficient in not further investigating either the television or book matters. *Cf. Allen v. Friel*, 2008 UT 56, ¶ 27, 194 P.3d 903 (affirming the dismissal of an ineffective assistance claim on a petition for postconviction relief because the claim was "vague and speculative"). *See generally State v. Garrett*, 849 P.2d 578, 581 (Utah Ct. App. 1993) (explaining that without specific facts to demonstrate that counsel's failure to object was due to deficiency rather than trial strategy, the defendant's claim amounted to speculation, and mere speculation is insufficient to overcome the presumption of sound trial strategy).

¶18 Furthermore, the evidence counsel actually presented at trial to portray Daughter as confused or mistaken about appropriate and inappropriate touching indicates that he was reasonably informed of Daughter's potential exposure to the subject matter. For example, he established that Daughter sometimes watched *Oprah*, *Dr. Phil*, and *America's Most Wanted* and followed up on Daughter's admission that her fear about disclosing the abuse

stemmed from an episode of *America's Most Wanted*, in which the father had been touching his daughter inappropriately and kidnapped her after she reported it; he elicited testimony from Detective Faulkner that when asked if "anyone else touched you in a way that made you uncomfortable," Daughter had reported innocent touching of her chest and buttocks by other children while they were playing; and he pointed out that Mother "specifically . . . brought up the good touch/bad touch analogy" in the context of a discussion with Daughter about Wright seeking custody that ultimately led to Daughter's disclosure.

¶19　Wright's claim that counsel's investigation of the mistake defense was deficient therefore amounts merely to speculation about what more counsel might have done. Furthermore, his use of the available information to pursue such a defense otherwise appears appropriate. As a result, Wright's claim that counsel was ineffective for failing to adequately investigate the mistake defense is unpersuasive.

¶20　Finally, Wright asserts that the mistake defense was strategically "inferior" to the fabrication defense "because it is incomplete: It explained how [Daughter] could manufacture false allegations of abuse, but not why she would." Wright's attack on trial counsel's strategic decision at this stage in the proceeding, however, is made with the benefit of hindsight. Even if Wright's proposed approach to his defense might actually have amounted to a better strategy than the one his counsel chose, we will not conclude that trial counsel was ineffective unless "there is a lack of any conceivable tactical basis for counsel's actions," *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 (citation and internal quotation marks omitted). *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *State v. Graham*, 2013 UT App 72, ¶ 15, 299 P.3d 644 (explaining that once counsel has investigated the underlying facts, strategic decisions regarding those facts cannot be deemed deficient except where there is no reasonable basis for them). In reviewing a claim of ineffective assistance,

"judicial scrutiny of counsel's performance must be highly deferential" because "it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Therefore, the court must "eliminate the distorting effects of hindsight . . . and . . . evaluate the conduct from counsel's perspective at the time."

*Menzies v. Galetka*, 2006 UT 81, ¶ 89, 150 P.3d 480 (alteration and omissions in original) (quoting *Strickland*, 466 U.S. at 689). Consequently, a reviewing court "will not second-guess trial counsel's legitimate strategic choices, however flawed those choices might appear in retrospect." *State v. Tennyson*, 850 P.2d 461, 465 (Utah Ct. App. 1993) (citing *Strickland*, 466 U.S. at 689).

¶21 The district court's findings on this subject, which Wright does not challenge, demonstrate that there were legitimate bases for counsel's decision to rely on a mistake defense at trial. The court explained that although at least one available witness had information with which counsel could have formulated a fabrication defense, "the theory that [Daughter] was induced [by Mother] to lie or decide on her own to falsify the allegations in order to prevent her father from obtaining custody is at odds with the evidence of [Daughter's] disclosure to her cousin" in July 2008, in which she urged the cousin not to tell anyone else, and with Mother's failing to "suspect[] abuse, allow[ing Daughter] to go on trips to visit [Wright] unsupervised, and believ[ing Wright] to be a good and loving father." Rather, the court reasoned, counsel judged that a mistake defense would be more persuasive to jurors, who would want an explanation for "how a child who came across as credible and intelligent would make up allegations against her father." The court concluded that, given the totality of the available evidence, counsel's decision to pursue a mistake defense rather than a fabrication defense was a "reasonable trial strategy."

¶22 We conclude that the district court's conclusion was supported by the evidence. The district court found that trial

counsel interviewed all but one of the available defense witnesses and was aware of the information to which each witness was prepared to testify. From this available information, counsel elected to pursue a mistake defense rather than a fabrication defense. While a fabrication defense appears viable, the exercise of professional judgment in choosing one approach over another is an endeavor that often involves a complex weighing of benefits and risks, and the decision counsel made in this instance amounted to a reasonable trial strategy given the totality of the evidence. Because there was a "conceivable tactical basis for counsel's action," *State v. King*, 2010 UT App 396, ¶ 31, 248 P.3d 984 (citation and internal quotation marks omitted), we "will not second-guess" his decision, *see Tennyson*, 850 P.2d at 465.

B. Counsel's Decision Not To Call Additional Witnesses or Present Documentary Evidence Falls Within the Scope of Legitimate Trial Strategy.

¶23    Wright next contends that trial counsel had no legitimate strategic reason for not calling additional defense witnesses or presenting certain photographs, videos, and phone (audio and text) messages that documented his and Daughter's loving and appropriate relationship. At the rule 23B hearing, the trial court concluded that counsel did not perform deficiently in choosing not to call certain additional defense witnesses because, although those witnesses appeared to be credible, they were on balance unlikely to have added substantively to the defense. For example, the court found that if Wright's brother had been called at trial, his testimony would have been much the same as that of Wright's mother and sister. Yet calling him posed some risk because he "was ambivalent about being a witness in light of his divided feelings" for Daughter, his niece, and Wright, his brother. Wright's aunt may have "added some information" about Daughter and Wright's relationship, but she was so focused on defending the family's practice of physically showing affection (specifically through back scratching) that she became "non-responsive to questions and seemingly very defensive" as soon as this issue was raised. A third witness offered information that was largely inadmissible.

¶24 With respect to the documentary evidence, the court concluded that counsel acted reasonably in not presenting photographs, videos, and phone messages from Daughter, provided to him by Wright and his family, which Wright contends showed that Daughter was happy and loving with him. The court found that counsel had explained that most of the photographs were of Daughter "smiling" "in the course of some fun or happy event" with Wright. Counsel did not want to admit too many of these photographs because he believed that the jury found Daughter to be both credible and compelling and was concerned that "the jury would look at the cute photos of [Daughter] in the jury room" and be "remind[ed of] . . . how much they believed her." Furthermore, many of the photographs were of Daughter's visit with Wright in Las Vegas after the abuse had stopped. And there was no dispute that Daughter had positive interactions with Wright after he moved to Las Vegas and the abuse stopped. Daughter even testified at trial that she "ha[d] a pretty good time visiting [Wright] in Vegas."

¶25 Counsel omitted the remaining documentary evidence for similar reasons. The court found that the videos and phone messages showing Wright and Daughter interacting positively did "not carry much weight" because Daughter herself had testified that she loved Wright and that they usually did fun activities together. The court also noted that counsel was reluctant to use a video "where [Wright] said, 'Tell me you love me'" to Daughter because he thought it "could be perceived as creepy by the jury" when viewed in the context of the abuse allegations. Wright has not challenged these findings. Therefore, we accept the facts as the district court found them. *See State v. Bredehoft*, 966 P.2d 285, 289 (Utah Ct. App. 1998).

¶26 These facts support the district court's conclusion that trial counsel's decision to exclude the documentary evidence did not amount to ineffective representation. For example, trial counsel determined that a fabrication defense would be unlikely to be successful because, among other things, it was "at odds with the evidence of [Daughter's] disclosure to her cousin. . . . [and] urg[ing]

her cousin not to tell anyone." Counsel therefore decided to present a defense that Daughter had mistaken innocent touching and manifestations of affection as sexual and inappropriate—a misperception fueled by her growing relationship with Mother's fiancé and exposure to age-inappropriate media. Counsel's decisions about which witnesses to call and the scope of the testimony he sought from them were thus intended to be consistent with a mistake defense. Counsel's decision not to use the photograph and video exhibits of Daughter was based on a similar rationale: counsel judged Daughter's testimony to be "very compelling" and "[h]e didn't want to inject her into the jury room . . . because the jury would look at the cute photos of [Daughter] . . . and the photos would remind them how much they believed her." Further, multiple photographs of Daughter enjoying the time she spent with Wright might undermine his theory that Daughter was simply mistaken or confused about the abuse, while the video evidence could cause the jury to view Wright's relationship with Daughter as "creepy." The court concluded that these exhibits had "limited evidentiary value" in that they "were not exculpatory because they "did not establish that the abuse did not occur" but instead "were, at best[,] cumulative of other exhibits and testimony that showed that [Wright] and [Daughter] appeared to have a loving and affectionate relationship" and, at worst, could be perceived negatively by the jury, as counsel feared. Counsel's other decisions regarding which evidence to present were also based on his concern that Daughter's credibility not be inadvertently enhanced by evidence that was of only limited value to the defense.[3] Therefore, the court's conclusion that counsel had a plausible strategic basis for declining to call additional defense witnesses or to introduce the additional documentary evidence

---

3. For instance, the court concluded that counsel had a "legitimate strategy" in "not want[ing] to dwell on the back-scratching" because although it served to corroborate Wright's description of his family members as physically affectionate with one another, it could also raise questions about their understandings of appropriate boundaries.

Wright provided appears to be well founded. When there is a conceivable trial strategy for counsel's decision, his performance is not deficient. *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980.

C. Counsel Was Not Deficient in Limiting the Use of Wright's Mother's and Sister's Testimonies.

¶27 Finally, Wright contends that counsel was ineffective for failing to fully utilize the defense witnesses on direct examination. Specifically, he asserts that counsel failed to question his mother and sister about their knowledge of information that could rebut the prosecution witnesses' testimonies. For example, Wright contends that his mother and sister could have countered Daughter's testimony that she did not love her dad and was scared during the time the abuse was occurring with specific examples of instances when Wright and Daughter demonstrated love and affection toward one another. He further claims that his mother and sister would have offered testimony to show that Daughter was visibly distressed during a visit with Wright in August 2008, which was very close in time to her disclosure to Mother. Wright explains that Daughter's visit was immediately preceded by a vacation with Mother and her fiancé, during which Mother insisted that Daughter call the fiancé, "Dad." Wright's sister could also have testified that Daughter had disclosed during the visit that Mother had told her that Wright was trying to get custody so as to take her away from Mother. According to Wright, testimony about the circumstances surrounding that visit with Daughter would have demonstrated Daughter's "motive to misinterpret innocent touches as abuse" because she was confused about how her relationships with Wright and Mother's fiancé could co-exist and she was worried that Wright might take her away from Mother. Wright further contends that the evidence could have shown that Mother had "a motive to encourage [Daughter] to allege abuse" to ensure that Wright would not receive custody of Daughter.

¶28 The district court determined, however, that trial counsel knew that Wright's mother and sister were prepared to testify to these things but that this "additional testimony would not have

advanced [trial counsel]'s theory of the case," which was mistake. The court reiterated that pursuing a mistake defense was a reasonable trial strategy that "the Court must sanction . . . , even if it appears flawed in retrospect." Wright has not challenged the district court's finding that counsel was aware that this testimony was available. And because counsel knew about this information but elected not to elicit it at trial based on his judgment that it would not further the mistake defense, Wright has failed to overcome the presumption that counsel's performance "fell below an objective standard of reasonable professional judgment" that would render his performance ineffective. *See State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (explaining that in order for a defendant to show that counsel performed inadequately, a defendant must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy" (citation and internal quotation marks omitted)).

¶29 The district court, however, did criticize one decision that trial counsel made regarding the scope of Wright's sister's testimony. As discussed above, the sister was prepared to testify that, in August 2008,[4] Daughter told her and Wright's mother about a conversation in which Mother had told Daughter that Wright was trying to get custody of her and take her away from Mother. Apparently based on his decision to pursue a defense of mistake rather than fabrication, counsel did not present this testimony. The court concluded that "[t]here was no legitimate trial strategy that would have allowed [counsel] to fail to put on this evidence." This conclusion is difficult to reconcile with the court's earlier determinations that the underlying decision not to pursue a fabrication defense was a legitimate strategic approach and that counsel was not deficient in failing to elicit this very testimony

---

4. In its findings, the court stated that this disclosure occurred in August 2010. Based on other portions of the record, it appears that the conversation must have occurred in 2008. We therefore treat the 2010 date as a typographical error.

from Wright's sister because it would not have supported the mistake defense counsel chose.

¶30    After carefully reviewing the district court's entire decision regarding counsel's trial performance, we have concluded that the apparent inconsistency results from the format of the court's decision. When we remanded for a rule 23B hearing, we asked the district court to make findings and conclusions about counsel's decisions regarding three specific categories of evidence: documentary exhibits, uncalled defense witnesses, and utilized defense witnesses. The court set up its written findings of fact and conclusions of law in this same arrangement. An overarching issue, however, in both the motion to remand and the arguments made at the rule 23B hearing was whether trial counsel adequately investigated the fabrication defense before he elected to pursue a mistake defense. As a result, the court made determinations in the context of each category of evidence about counsel's investigation of the fabrication defense and his decision to instead defend on the basis of mistake. In all but this one instance regarding the sister's testimony about Wright seeking custody, the court determined that counsel had a legitimate strategic reason for his decision to use only the evidence supporting a mistake defense. When the court evaluated counsel's decisions regarding the sister's testimony, it again stated that "counsel's strategy of not maligning [Mother] and to try to present [Daughter] as confused was a legitimate strategy." Yet it then went on to say that counsel was deficient for precluding sister's testimony about Daughter's statement because "this evidence could have provided a basis to believe that [Daughter] and/or [Mother] had a motive to falsify the allegations."

¶31    The court appeared to be stating that in this category of evidence—the use of Wright's mother's and sister's testimonies—there was some factual basis for a fabrication defense. The court went on to conclude, however, that when viewed in the context of the evidence as a whole, a fabrication defense still would have been unlikely to succeed because even if the jury believed the sister's testimony, an event the court deemed unlikely, there was a dearth of other evidence to corroborate a claim that the abuse

allegations had been fabricated. This assessment of the relative strength of the fabrication defense thus seems consistent with the court's earlier statement that "[a]lthough the testimony offered by . . . [Wright's sister] may have been material to a jury, counsel's strategy . . . to try to present [Daughter] as confused was a legitimate strategy."

¶32    As previously discussed, we agree that the district court's uncontested findings regarding the substance and content of available witness testimony and documentary evidence support a conclusion that it was reasonable trial strategy for trial counsel to pursue a defense of mistake rather than fabrication. And based on our view of the totality of the evidence and the court's decision as a whole, we do not see the court's isolated criticism of trial counsel's performance to undermine its overarching decision that counsel did not perform deficiently in deciding on a defense strategy, even when the potential value of Wright's sister's testimony is taken into account. *See State v. Bredehoft*, 966 P.2d 285, 289 (Utah Ct. App. 1998) ("In ruling on an ineffective assistance claim following a Rule 23B hearing, [appellate courts] defer to the trial court's findings of fact, but review its legal conclusions for correctness." (citation and internal quotation marks omitted)). Because Wright has not demonstrated that counsel's performance in choosing a strategic approach to the defense was deficient, his ineffective assistance claim regarding counsel's use of his mother's and sister's testimonies must also fail.

¶33    In summary, we agree with the district court's conclusions that trial counsel's investigation provided him with sufficient information about available witnesses and exhibits to allow him to make an informed decision about whether to pursue a fabrication defense or a mistake defense at trial. Counsel had a legitimate basis for choosing the mistake defense and making decisions about what evidence to present. Because his decisions not to present the documentary exhibits or the testimony of Wright's brother, aunt, and friend and to limit the scope of the testimony of Wright's mother and sister were based on this strategic decision and tactical considerations about credibility and effectiveness of particular

evidence, they did not amount to deficient performance. Accordingly, we conclude that the district court did not err in determining that counsel provided effective assistance in investigating possible defenses and defending Wright at trial.

## II. Detective Faulkner's Testimony

¶34 Wright next challenges Detective Faulkner's testimony regarding the prevalence of delayed reporting of sexual abuse. Wright's challenge involves two statements: (1) Detective Faulkner's response, "No. No." when the State asked, "Is it uncommon for you to have cases involving a disclosure that comes years after an initial event of touching?" and (2) Detective Faulkner's statement, in response to the State's inquiry about how many of the cases she had investigated involved a significant delay in reporting, that "at least a third of my cases . . . are victims where they have either become 18 and are [o]lder or they've endured the abuse living with the suspect without telling anyone for years."

¶35 Utah courts have recognized that "'[d]elayed discovery and reporting are common in [child sexual abuse] cases.'" *State v. Bair*, 2012 UT App 106, ¶ 47, 275 P.3d 1050 (alterations in original) (quoting *State v. Hoyt*, 806 P.2d 204, 209 (Utah Ct. App. 1991)). In *Bair*, for example, a detective testified that "'[b]ased on the probably hundreds of [abuse] cases [he has] investigated, it's not uncommon for a victim not to disclose initially.'" *Id.* ¶ 7 (alterations in original). The defendant sought reversal on appeal because such testimony "invaded the province of the jury" to assess credibility. *Id.* ¶ 44. We observed that "[s]imply noting that abuse victims often delay reporting did not" vouch for the victim's veracity because that testimony reflected "a fact already recognized by Utah courts." *Id.* ¶ 47. As in *Bair*, Detective Faulkner's negative response to the question about whether it was uncommon to have cases where the abuse went unreported for a period of time simply relayed a common fact to the jury and did not convey any information about how it should view the testimony or other evidence in the case.

¶36    Detective Faulkner's testimony, however, went a step beyond recognition of the general principle that delayed reporting is common when she reported that one-third of the "[h]undreds" of "child sex abuse" cases that she has investigated over five years involved delayed reporting of the abuse. According to Wright, this kind of quasi-statistical information falls within the realm of "knowledge [that] is not within the ken of the average bystander," *State v. Rothlisberger*, 2006 UT 49, ¶ 34, 147 P.3d 1176, and is therefore governed by evidence rules dealing with expert testimony, *id.* ¶¶ 11–12 ("Expert testimony, which is treated under rule 702 [of the Utah Rules of Evidence], is opinion or fact testimony based on scientific, technical, or otherwise specialized knowledge" and is subject to "various qualification and advance disclosure requirements."). Wright further contends that this quasi-statistical information "encouraged the jury 'to focus upon a seemingly scientific, numerical conclusion rather than to analyze the evidence before it and decide where the truth lies.'" (Quoting *State v. Rammel*, 721 P.2d 498, 501 (Utah 1986).) The State counters that even if Detective Faulkner's testimony regarding the percentage of her cases that involved delayed reporting was inadmissible, its admission did not prejudice Wright's case and thus was harmless error not requiring reversal. *See generally State v. Otterson*, 2010 UT App 388, ¶ 11, 246 P.3d 168 ("Utah appellate courts have long required a showing of harm to warrant reversal in the face of an erroneous evidentiary ruling." (citing *State v. Kohl*, 2000 UT 35, ¶ 17, 999 P.2d 7; *State v. White*, 880 P.2d 18, 21 (Utah Ct. App. 1994))).

¶37    We agree with the State. Even assuming for purposes of appeal that Detective Faulkner's testimony about the percentage of cases involving delayed reporting was inadmissible, Wright has not demonstrated any harm that resulted from its admission. Wright argues that because the jury acquitted him of one charge of aggravated child sexual abuse, it likely would have acquitted him of the second charge had it not heard Detective Faulkner's testimony. Wright does not, however, contend that Detective Faulkner lacked the knowledge or experience to offer such information, even conceding that she had investigated

"[h]undreds" of sexual abuse cases. Nor does he contest the accuracy of her statement. Indeed, an incidence of "one-third" appears to be generally consistent with her testimony that delayed reporting is not uncommon—testimony that the jury could properly hear—and the increment of precision it adds to the more general statement seems too small to undermine the defense in any material way.[5] Without any showing that the admission of Detective Faulkner's statement was likely to have unfairly affected the outcome of the proceedings, we will not disturb the jury's verdict, even if the testimony was erroneously admitted.

## III. Prosecutor's Closing Remarks

¶38    Finally, Wright contends that the State engaged in prosecutorial misconduct during its closing argument. Specifically, Wright takes issue with the prosecutor's response to trial counsel's contention that Daughter transmuted an innocent touch into an inappropriate one to help her justify referring to Mother's fiancé as "Dad" and to eliminate Wright from her life. Wright's counsel argued that Daughter "has gotten exactly what she wants. She is with the family she wants to be with[ and s]he doesn't have to see [Wright]." The prosecutor responded directly to this argument in rebuttal:

> [T]here is absolutely no reason not to believe [Daughter], who, as I told you before gave you every single piece of evidence that you need for the elements of this crime. [Daughter] doesn't want to hurt her father. She loved him even after he did horrible things to her. She just wants him to stop hurting her. You have the power to make that stop.

---

5. The statement that only one-third of the cases involved delayed reporting, a relatively low percentage, could even be seen as somewhat helpful to the defense because it eliminated any speculation that "not uncommon" might be a significantly greater proportion.

Wright argues that these remarks were improper because they "divert[ed] the jury from its duty to decide the case on the evidence." *See State v. Todd*, 2007 UT App 349, ¶ 18, 173 P.3d 170 (citation and internal quotation marks omitted). He further contends that the final statement is the most damaging because it was "'designed to appeal to the jurors' sentiments by charging the jury to convict [Wright] in order to ensure [Daughter's] safety.'" (First alteration in original.) (Quoting *State v. Tosh*, 91 P.3d 1204, 1212 (Kan. 2004).) The State counters that Wright opened the door to such remarks by attributing a specific motive to Daughter that provoked what amounted to a "fair reply" from the prosecutor. *See United States v. Schwartz*, 655 F.2d 140, 142 (8th Cir. 1982) ("It is well settled that prejudicial error does not result from the improper remarks made during closing argument when such remarks were provoked by the opposing counsel. When the defense counsel chose to open the door on the issue . . . , the counteracting statement made by the prosecutor fell within the doctrine of fair reply." (citation omitted)); *United States v. Daniels*, 617 F.2d 146, 150 (5th Cir. 1980) (same).

¶39 "Generally speaking, in argument to the jury, counsel for each side has considerable latitude and may discuss fully from their viewpoints the evidence and the inferences and deductions arising therefrom." *State v. Tillman*, 750 P.2d 546, 560 (Utah 1987). However, "[a] prosecutor's actions and remarks constitute misconduct that merits reversal if the actions or remarks call to the attention of the jurors matters they would not be justified in considering in determining their verdict and, under the circumstances of the particular case, the error is substantial and prejudicial . . . ." *Id.* at 555. "In determining whether a given statement constitutes prosecutorial misconduct, the statement must be viewed in light of the totality of the evidence presented at trial." *State v. Longshaw*, 961 P.2d 925, 927 (Utah Ct. App. 1998) (citation and internal quotation marks omitted).

¶40 We agree with the State that the first four sentences of the prosecutor's response fall within the fair reply doctrine. Wright encouraged the jury to view the facts and inferences from the

evidence in a manner that supported his theory that Daughter was mistaken about how Wright had touched her, and in closing suggested that her mistake had an aspect of calculation to it in that it furthered her goal of getting Wright out of her life so she could be "with the family she wants to be with." In response, the State was entitled to argue from the evidence at trial that Daughter had a different motivation for the accusations than simply eliminating Wright from her life, that is, to protect herself from abuse.

¶41 We agree with Wright, however, that the prosecutor's final statement—"You have the power to make that [(the abuse)] stop."—is beyond the scope of a fair reply. It does not rebut any statements made by Wright; instead, the statement calls on the jury to assume the responsibility of ensuring Daughter's safety. Such a statement appeals to the jurors' emotions by contending that the jury has a duty to protect the alleged victim—to become her partisan—which diverts their attention from their legal duty to impartially apply the law to the facts in order to determine if Wright had committed the crimes of aggravated sexual abuse of a child for which he was on trial. *See generally Tosh*, 91 P.3d at 1212 (noting that asking the jury to protect the victim of sexual abuse "fell outside the wide latitude afforded a prosecutor" because such comments are "designed solely to inflame the passions of the jurors and divert their attention" from the evidence that is intended to help them decide guilt or innocence). Yet, despite the impropriety of the prosecutor's remark, it does not require reversal. As the Utah Supreme Court stated in *State v. Ross*, 2007 UT 89, 174 P.3d 628,

> The test of whether the remarks made by counsel are so objectionable as to merit a reversal in a criminal case is, did the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by those remarks.
> . . . . If prosecutorial misconduct is established, the State must show that the error was harmless beyond a reasonable doubt.

*Id.* ¶ 54 (citation and internal quotation marks omitted) (setting forth this standard in context of plain error review).[6]

---

6. Whether the defendant or the State bears the burden of showing harm and what the standard of proof is if the burden shifts to the State (whether harmless beyond a reasonable doubt or some lesser standard) are questions that we do not resolve because the issue has not been briefed in a meaningful way and the questions are not readily resolvable under our current precedent. The Utah Supreme Court in *State v. Ross*, 2007 UT 89, 174 P.3d 628, sets forth the general burden-shifting principle in a case that involves an instance of prosecutorial misconduct that did not implicate the defendant's fundamental constitutional rights. But without disavowing *Ross*, a recent case, *State v. Maestas*, 2012 UT 46, 299 P.3d 892, seems to call into question the breadth of *Ross*'s application. Whereas in *Ross*, the prosecutor's misconduct involved a closing argument that distorted the evidence related to the question of whether the defendant's two charges were part of a single criminal episode, 2007 UT 89, ¶ 56, in *Maestas*, the prosecutor had commented on the defendant's right to remain silent at trial, a significantly deeper intrusion on the defendant's fundamental rights, 2012 UT 46, ¶ 161. And in *Maestas*, the supreme court seemed to suggest that the requirement that the state show that the prosecutorial misconduct was harmless beyond a reasonable doubt applied only when the error amounted to the infringement of a defendant's fundamental rights: "'[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the *constitutional error* was harmless beyond a reasonable doubt.'" *Id.* ¶ 162 (emphasis added) (footnote omitted) (quoting *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987), a case also involving a prosecutor's remark on the defendant's choice to remain silent).

Nor does our own precedent simplify the issue. In *State v. King*, 2010 UT App 396, 248 P.3d 984, we required the defendant to shoulder the burden of establishing prejudice from a prosecutor's misconduct because the defendant had not objected to the prosecutor's remarks at trial, even though *Ross* itself involved a similar preservation problem. *Id.* ¶ 26. In *State v. Koslov*, 2012 UT

(continued...)

¶42 "In reviewing whether the jury was influenced by the [prosecutor's] statement, we consider the circumstances of the case as a whole." *State v. Koslov*, 2012 UT App 114, ¶ 43, 276 P.3d 1207 (citation and internal quotation marks omitted). Wright's claim on appeal that the prosecutor committed *reversible* misconduct is based on an argument that all five of the contested statements were improper. Yet, we have concluded that all but one statement amounted to a fair reply to defense counsel's own remarks. The prosecutor's improper remark was thus only a single sentence during a closing argument and rebuttal that fills fifteen transcript pages of otherwise appropriate remarks. *But see Tosh*, 91 P.3d at 1210–13 (concluding that the prosecutor's plea to the jury to protect the victim from further sexual abuse by her father was "intentional and not done in good faith" when the closing statement also included a suggestion that the defendant would essentially "'rape [the victim] again'" if his version of the events were believed and a statement that implied that the burden of proof had shifted to the defendant). And although the misconduct occurred at the close of

---

6. (...continued)
App 114, 276 P.3d 1207, on the other hand, we acknowledged the harmless beyond a reasonable doubt standard discussed in *Ross* and assumed for purposes of appeal that the burden shifted even where the defendant did not preserve the issue in the trial court. 2012 UT App 114, ¶ 42 n.9.

In our decision here, in deference to the language of *Ross*, we take *Koslov*'s approach, assuming that the harmless beyond a reasonable doubt standard applies, even though the challenge to the error was unpreserved and does not involve a violation of a fundamental constitutional right, on the basis that "if the State can show that the error was harmless beyond a reasonable doubt, Defendant would be unable to establish that the error was prejudicial" enough to make out a showing of plain error or ineffective assistance of counsel, in any event. *Id.* (citation and internal quotation marks omitted). The questions of when burden-shifting occurs in a prosecutorial misconduct case and the applicable standard for showing harmlessness if it does, however, remain unsettled and should be addressed in an appropriate case.

the State's rebuttal, when Wright had no opportunity to respond, the court immediately reminded the jury of the importance of the jury instructions, particularly emphasizing the fact that "lawyers are advocates and they do represent their clients. And they are trying to persuade you of their views of the case, what they advocate. What they tell you, as was just done in opening and closing, is not evidence." The court also reiterated that its other instructions, which included an admonition that the jurors not allow themselves "to be influenced by sentiment, conjecture, sympathy, passion, prejudice, or public feeling," are "all important" and should be followed by the jury. In the absence of any circumstances suggesting otherwise, courts presume that the jury follows such instructions. *State v. Menzies*, 889 P.2d 393, 401 (Utah 1994). *See also, e.g.*, *Carrasco v. Horel*, No. C 07-5666 MMC (PR), 2011 WL 6181447, at *10 (N.D. Cal. Dec. 13, 2011) (concluding that although the prosecutor's statement that the jury has "'to stand up to these gangs'" "urged the jury to convict for reasons unrelated to [the defendant]'s guilt or innocence," it was not prejudicial because it was an isolated remark in a "lengthy and otherwise proper closing argument," the jury was instructed not to consider the attorneys' arguments as evidence, and the other evidence of the defendant's guilt was strong); *People v. Vigil*, No. C037810, 2003 WL 1985221, at *9 (Cal. Ct. App. Apr. 30, 2003) (concluding that the defendant was not prejudiced by prosecutor's plea for the jurors to "'protect [the victim] in your verdicts. . . . [a]nd . . . tell [defendant] it's over. You are not going to hurt this child anymore'" because the jury was instructed to base its rulings on the facts, not "'sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling'" (first and last alteration in original)).

¶43   Accordingly, we are persuaded that the prosecutor's isolated statement to the jury was harmless beyond a reasonable doubt. Wright's prosecutorial misconduct claim therefore fails.

### IV. Cumulative Error

¶44   Wright contends that even if the errors by the court and counsel were individually harmless, they cumulatively require reversal of his conviction. "Under the cumulative error doctrine,

[appellate courts] will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred." *Id.* But "[i]f the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." *State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878 (declining to apply the cumulative error doctrine where the claims on appeal did not constitute error or were harmless); *State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7 (determining that there was no cumulative error where the defendant's claims either did not amount to error or were so minor that they did not result in harm); *see also State v. Colwell*, 2000 UT 8, ¶ 44, 994 P.2d 177 (stating that because it had determined that all of the claimed errors had been properly cured at trial and were therefore not harmful to the defense, "the cumulative errors d[id] not undermine [the court's] confidence that the defendant [had] received a fair trial").

¶45 We have rejected each of Wright's numerous claims of error, concluding that either no error occurred or any error was harmless. Our assessment does not change when we view the one error and the one presumed error (the detective's anecdotal evidence of the incidence of late reporting and the prosecutor's statement on rebuttal) in conjunction with one another. The errors were relatively minor in the context of the trial as a whole and do not take on significance when considered together. Accordingly, we do not find Wright's cumulative error argument persuasive.

CONCLUSION

¶46 The district court correctly determined that Wright did not receive ineffective assistance of counsel when his trial attorney legitimately decided to pursue a mistake defense rather than one based on fabrication and commensurately limited the evidence and witnesses he presented. Although we concluded that the prosecutor's final remark in closing argument was error and we

assumed, without deciding, that the admission of Detective Faulkner's testimony on the percentage of cases which involved delayed reporting was error, neither was sufficiently prejudicial to require reversal, whether considered alone or together. Accordingly, we affirm Wright's conviction for aggravated sexual abuse of a child.

———————